LEHIGH–NORTHAMPTON AIRPORT AUTHORITY, Lehigh Valley International Airport, Appellant

v.

Charlton T. FULLER, a/i/a C. Thomas Fuller and Willow Brook Land Development, Corp., LLC.

In re Condemnation of Properties at Northampton County and Lehigh County.

Lehigh–Northampton Airport Authority, Lehigh Valley International Airport

v.

Charlton T. Fuller, a/i/a C. Thomas Fuller and Willow Brook Land Development, Corp., LLC, Appellants

In re Condemnation of Properties at Northampton County and Lehigh County.

Commonwealth Court of Pennsylvania.

Argued Sept. 7, 2004.

Decided Nov. 24, 2004.

Charles J. Fonzone, Allentown, for appellant.

Michael S. Hino, Berwyn, for appellee.

BEFORE: FRIEDMAN, Judge, and LEADBETTER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

Lehigh–Northampton Airport Authority (Airport Authority) appeals from an order of the Court of Common Pleas of Lehigh County (trial court) which denied the Airport Authority's post-trial motion to mold the verdict of $3,500,000.00 to reduce the verdict by $23,300.00 for clean up costs incurred after condemnation, granted their motion to mold the verdict by reducing the verdict by $803,098.50 and further ordered the Clerk of Courts—Civil Division to enter judgment in favor of the Charlton T. Fuller a/i/a C. Thomas Fuller (Fuller) and Willow Brook Land Development Corporation, LLC, (Willow Brook) (collectively, Condemnees) and against the Airport Authority in the amount of $2,696,901.50. We affirm.

The Condemnees cross-appealed from the January 12, 2004 order of the trial court which denied Condemnees' petition for reimbursement of costs and delay damages without prejudice to renew following final judgment. We affirm.

Fuller was the owner of approximately 600 acres of land located in both Lehigh and Northampton Counties. In 1995, Willow Brook obtained an equitable interest in that land by virtue of an Option Agreement. That same year Condemnees began exploring the possibility of subdividing portions of that land for residential development, obtaining municipal approvals and beginning excavation and improving a 51 acre parcel for a residential subdivision.

On September 2 and 8, 1997, Condemnees jointly filed three sets of proposed plans for a residential subdivision with the appropriate municipalities for an adjacent 107–acre parcel of land. At least one of those plans was designed in compliance with all existing zoning regulations and would therefore be considered a 'by right' zoning plan. It is this 107–acre parcel that is the subject of this litigation.

On September 11, 1997, the Airport Authority filed a Declaration of Taking by which it condemned the 107–acre parcel of land. At the time of the condemnation, none of the proposed plans that were filed

on September 2 and 8 had been approved by the governing municipalities.

A Board of Viewers was appointed and after a hearing, awarded the Condemnees $2,000,000.00 just compensation for the 107–acres of condemned land. Both parties appealed and on August 27, 2003, a de novo jury trial was held. The jury awarded Condemnees $3,500,000.00 just compensation.

■ The Airport Authority timely filed post-trial motions seeking a new trial, alleging errors of law, erroneous evidentiary rulings and that the verdict was against the weight of the evidence. The trial court found in pertinent part as follows:

> Because the Development Approach is a widely accepted valuation method, which in this case was applied to a development plan which was reasonably certain to be built as it complied with all applicable zoning regulations and because testimony regarding the number and value of lots was only one of several factors considered in determining the value of the condemned land as a whole, the admission of such testimony was not reversible error.
>
> . . .
>
> [T]he "phasing plan" found at page 160 of Mr. Lesavoy's report was included for reasons other than determining the value of land as a sum of individual lots. Testimony showed that phasing is used when a subdivision is too large to develop in a single project to accommodate costs and financing, development, and marketing. To this end, condemnees' experts looked to an estimated phasing plan to determine costs relevant to discounting the value of the land, as a whole, as of the date of condemnation. Here, the estimated phasing plan was part of the facts and data considered by Mr. Lesavoy in arriving at his valuation

opinion, and so was properly admitted pursuant to the Code.

For the foregoing reasons, no errors of law were committed entitling the Airport to a new trial.

. . .

A review of the record reveals that few references were made regarding the condemnation of the adjacent parcel and there is not indication that these references had any negative impact on the jury. The Airport has failed to establish any harm caused by admission of this relevant testimony.

. . .

Here, there is no evidence of willfulness on the part of the condemnees' counsel and the Airport's counsel were served with the witness's name and report thirteen (13) days before trial began on August 28, 2003. Moreover, the report and testimony of Mr. Hughes did not deviate substantially from condemnees' valuation testimony presented to the Board of Viewers, so that the Airport should have been prepared to address such valuation testimony at trial, regardless of who was presenting it, and not prejudiced thereby.

Allowing Mr. Hughes to testify was not an abuse of discretion and does not warrant a new trial.

. . .

Another motion in limine submitted by the Airport on August 13, 2003, objected to anticipated cross examination of expert Laura Laudone–Weiss relating to her prior services rendered for the Airport. . . . It is permissible to impeach an expert witness by demonstrating that she is partial to a party for whom she is testifying. Any bias or partisanship on the part of such a witness is relevant evidence and is proper subject for cross-examination.

. . .

Here, not only was approval to subdivide foreseeable, but testimony established it was probable since the plan submitted and used for valuation complied with all applicable zoning ordinances. No two properties are alike, but the condemnees' experts detailed the reasons for using the comparables at issue, and, upon review of the record, we find that reasoning to be sound. The testimony was subject to cross-examination and ultimately a matter of weight and credibility for the jury.

. . .

The Airport objected to the introduction of several documents, specifically, condemnee expert's Erosion and Sedimentation Control Narrative, Drainage Report and Traffic Report, collateral subdivision plans and Mr. Zawarski's letter of interest to purchase. . . . The objections were overruled. . . . In this case the documents to which the Airport objects were all competent—prepared in the course of business or original, authenticated documents—and relevant to, *inter alia,* the determination of the highest and best use of the condemned property and consideration of fair market value.

Even assuming arguendo, that an error in an evidentiary ruling was committed, the Airport has failed to demonstrate such alleged error affected the verdict in this case.

. . .

The condemnees' experts all agreed that the highest and best use of the condemned property was as a residential subdivision and testified that the condemnees had submitted a 'by right' plan, which complied with all applicable zoning regulations, meaning that final approval was more than possible, it was probable. . . . The testimony revealed the reasons for the experts' choices, how they arrived at the numbers they used and how those values and costs were factored into the determination of final fair market value of the condemned property.

. . .

After a complete review of the record in this case, it is clear that the jury had a more than reasonable basis of evidence and testimony from which to reach their verdict. The jury's verdict is not shocking nor is it against the weight of the evidence. Consequently, the Airport's motion for a new trial on the basis that the verdict is against the weight of the evidence is denied.

All remaining issues raised by the Airport in its post-trial motions have been waived.

The Airport seeks an Order to Mold the Verdict to reduce it first by $23,300.00, the cost incurred by the Airport to remove debris left on the land by the condemnees, and by and [sic] additional $803,098.50, representing the amount already paid by the Airport for Estimated Just Compensation. . . .

Counsel for the Airport not only questioned his witness in detail regarding this clean up and the cost thereof, but also addressed this amount to be subtracted from any verdict in his closing argument. The Airport's motion to mold the verdict and reduce it by $23,300.00 is denied.

It is undisputed, however, that the Airport paid to the condemnees Estimated Just Compensation in the amount of $803,098.50 on or about January 16, 1998. Accordingly, the final judgment should be reduced by that sum previously paid by the Airport to the condemnees.

The Airport's motion to mold the verdict and reduce it by $803,098.50 is therefore granted.

Trial Court Opinion, February 19, 2004, at 9–22. The Airport Authority appealed this decision to our Court. Condemnees then filed a cross-appeal with our Court.[1]

The Airport Authority contends that the Trial Court erred in permitting the Condemnees to value the land as the sum of the values of the proposed individual lots, by permitting the Condemnees to value the proposed individual lots under the Development Approach, which is an income method of valuation, by permitting the Condemnees to value the proposed individual lots with sales of property that are not comparable to the land and/or pre-condemnation offers, in permitting improper testimony and evidence on the proposed subdivision plans from the Condemnees' witnesses and/or the preclusion of testimony and evidence on the proposed subdivision plans from the Airport Authority's witnesses, in precluding the testimony and evidence from the Airport Authority's experts, and in permitting improper and prejudicial testimony and evidence on the timing of the subject condemnation and/or the Airport Authority's prior condemnations for the jury's consideration.

Just compensation is defined as the difference between the fair market value of the property before and after condemnation. Section 602(a) of the Eminent Domain Code (Code), 26 P.S. § 1–602(a). Section 603 of the Code provides as follows:

Fair market value shall be the price which would be agreed to by a willing and informed seller and buyer, taking into consideration, but not limited to, the following factors:

(1) The present use of the property and its value for such use.

(2) The highest and best reasonably available use of the property and its value for such use.

(3) The machinery, equipment and fixtures forming part of the real estate taken.

(4) Other factors as to which evidence may be offered as provided by Article VII.

26 P.S. § 1–603.

First, the Airport Authority contends that the trial court erred in permitting the Condemnees to value the land as the sum of the values of the proposed individual lots. The Airport Authority contends that the trial court violated the "Unit Rule" by individually valuing and then adding the sum of the values of the proposed individual lots to determine the value of the land as a whole. The "Unit Rule" prohibits valuations where the individual lots or units are given a value and then, in order to determine the value of the entire property, the values of the individual lots/ units are simply added together. *See Department of Transportation v. Becker,* 118 Pa.Cmwlth. 620, 546 A.2d 1282 (1988).

In *In re Right of Way for Legislative Route 1046,* 146 Pa.Cmwlth. 344, 605 A.2d 1286, 1293 (1992), our Court stated in pertinent part as follows:

The record shows that [the expert's] testimony did not violate the "unit" rule, because he gave only values for the whole property before and after the taking. He testified that the way he arrived at his valuation was to first conclude that the highest and best use of the property was to use the house, outbuildings, and 1.35 acres as a residence

---

1. Our review in an eminent domain proceeding is limited to determining whether the findings of fact are supported by competent evidence and whether the common pleas court committed legal error. *Department of Transportation v. Schodde,* 61 Pa.Cmwlth. 77, 433 A.2d 143 (1981).

and to sell the remaining acreage for commercial development. The combined value equaled $327,000. [The expert] testified under cross-examination, that in determining fair market value, he did not simply add up the separate valuations, but rather made a conscious determination that, in this particular case, the sum of the parts equaled the whole. Cross-examination, as in this case, was available to test the strength of the [expert's] testimony, and for the fact finder to determine the persuasive weight of his testimony.

*Id.*, 605 A.2d at 1293 (quoting *Becker*, 546 A.2d at 1285).

█ In the present controversy, the trial court found that the Condemnees' experts valued the property as a whole, not as individual units, and we agree.[2] The Airport Authority's contention that an expert is to provide a before and after value of the land without providing a rationale for his conclusions is in error. Section 705 of the Code states in pertinent part as follows:

> Whether at the hearing before the viewers, or at the trial in court on appeal: (1) A qualified valuation expert may, on direct or cross-examination, state **any or all facts and data which he considered in arriving at his opinion,** whether or not he has personal knowledge thereof, and his statement of such facts and data and the sources of his information shall be subject to impeachment and rebuttal.

26 P.S. § 1–705. (Emphasis added). In *Columbia Gas Transmission Corp. v. Piper*, 150 Pa.Cmwlth. 404, 615 A.2d 979 (1992), our Court determined that:

> Although Piper and his witnesses testified to "isolated pieces of data" which were factors Piper considered in arriving at his estimate of damages, those "pieces of data" were not presented to the jury as separate items of damage to be added up to determine the overall damages. Columbia's position would appear to preclude all testimony from a condemnee except for that of before-taking and after-taking value, a result that is contrary to the liberal testimony rule of Section 705(1) of the Code.

*Id.* at 986. A review of the record reveals that the Condemnees' experts did consider the value of proposed individual lots in their determination of a "total" fair market value for the land. The attorney for the Authority asked the Court to exclude the testimony of Mr. Lesavoy and Mr. Hughes, the experts for Fuller, the condemnee, as not complying with the unit rule, and that the development approach is inappropriate under this particular case. The trial court denied the motion.

The Unit Rule prohibits valuations where the individual lots or units are given a value and then, in order to determine the value of the entire property, the values of the individual lots/ units are simply added together.

In the present controversy, Mr. Lesavoy began his analysis under the sales approach by valuing "the whole property as one piece". In doing this he explained that he took values of sales of comparable properties and assigned the values to the similar type units on the property. He needed sales for 283 lots. He divided the 283 lots into three different types of units, twin units, single family units and large single family units, and matched a comparable sale to each type. He did testify that he gave the 110 twin units a value of 24,000.00 each and so forth. **However, he did not reach his ultimate valuation by**

---

2. Condemnees' expert testified that, "we are valuing the whole property as one, as one piece." Notes of Testimony, Frederick Lesavoy, at 126a.

**simply adding up the values of the individual units.** Mr. Lesavoy testified further as to how he reached his ultimate valuation by adding and subtracting certain other values, expenses etc. If you merely add up his unit values you would have, under the comparable sales approach, $11,636,000.00 and his ultimate valuation under this approach was $4,110,000.00. Under the Development approach, merely adding his unit values would lead to a value of $4,258,500.00 and his ultimate valuation under this approach was $3,840,000.00.

Similarly to the method in, *In re Right of Way for Legislative Route 1046,* Mr. Lesavoy testified that he did not simply add up the separate valuations. Mr. Lesavoy merely started with those values and continued his valuations from there. Mr. Lesavoy gave a value of the land as a whole and provided extensive detail of his rationale. As in *Columbia Gas Transmission Corp. v. Piper,* "those 'pieces of data' were not presented to the jury as separate items of damage to be added up to determine the overall damages." *Id.* at 986. The trial court was correct in permitting the Condemnees' experts to testify as to how they arrived at their valuations of the property.

Second, the Airport Authority contends that the trial court erred in permitting the Condemnees to value the proposed individual lots under the Development Approach, which is an income method of valuation.

In *Penn's Grant Associates v. Northampton County Board of Assessment Appeals,* 733 A.2d 23 (Pa.Cmwlth.1999), while recognizing that the Developmental Approach for valuing undeveloped property is excluded by many jurisdictions, our Court assumed the Developmental Approach was an allowable method to assess the value in a tax assessment case and noted that:

> [T]he developmental approach to assessing property has been accepted by many courts as an appropriate valuation method, *see, e.g., Clifford v. Algonquin Gas Transmission Co.,* 413 Mass. 809, 604 N.E.2d 697 (1992); *Robinson v. Town of Westport,* 222 Conn. 402, 610 A.2d 611 (Conn.1992); *Ramsey County v. Miller,* 316 N.W.2d 917 (Minn.1982); [*147.47*] *Acres of Land in Monroe County,* 352 F.Supp. 1055 (M.D.Pa.1972)....

*Id.* 733 A.2d at 28, fn. 11.

Although lower federal court cases are not binding, the case of *United States of America v. 147.47 Acres of Land in Monroe County, Pennsylvania,* 352 F.Supp. 1055, (M.D.Pa.1972) is instructive in that the record reveals that the Condemnees did lay the proper foundation for the 'lot method' appraisal or 'developer's residual approach'.[3] The Condemnees showed that the land was ripe for development, that their expectation of securing all of the necessary zoning and other required permits was reasonable, and that the development of the property was within the reasonably foreseeable future.

In *Penns Grant Associates,* we set forth the steps that are generally used by appraisers in applying the development approach to raw land. The procedural steps were set forth as follows:

1. Prepare subdivision layout to determine number, size and shape of typical lots.

2. Estimate retail value of lots.

3. Estimate direct development costs.

4. Estimate indirect development costs.

---

**3.** The Development Approach to valuation is also known as the "cost of development method", the "anticipated use method", the "lot method", the "developer's residual approach", the "developer's absorption method" and the "subdivision approach".

5. Compute income residual to developer's profit and land (Step 2 minus Steps 3 and 4).

6. Deduct developer's profits from Step 5.

7. Estimate the amount of time required to develop and sell out the subdivision.

8. Discount anticipated income stream into a current indicated raw land value. J.D. Eaton, REAL ESTATE VALUATION IN LITIGATION 223 (Amer. Inst. Of Real Estate Appraisers 1982). Where the land has been subdivided, step 1 is unnecessary and makes the figures obtained from steps 2, 3, 4 and 7 more reliable.... Eaton, at 212.

*Penn's Grant Associates,* 733 A.2d at 28, fn. 10.

■ Although the use of the "Development Approach" has never been squarely before this Court in a condemnation proceeding, it is an approach commonly currently used in the field to value multiple unimproved lots in a subdivision or potential subdivision as a unit. In using the Development Approach to find the true market value the expected sale prices of the lots are considered as well as the direct and indirect development and marketing cost. *Penn's Grant Associates,* 733 A.2d at 28.

■ Modern appraisal methods demand modern approaches which should be recognized by our courts so long as a proper foundation is laid to eliminate speculation as J.D. Eaton suggests:

For land that has been fully subdivided, the problems involved with the partially developed subdivision evaporate because the costs to the developer are no longer speculative, the value of the individual lots in the market may be ascertained with as much certainty as in any other condemnation proceeding, and the possibility of the property's use is no longer remote. Eaton, at 212.

*Penn's Grant Associates,* 733 A.2d at 28, fn. 10.

■ In the present controversy, the Condemnees had filed proposed plans for a residential subdivision on the subject property. Thus, step one was unnecessary and made steps 2, 3, 4 and 7 more reliable. The trial court's finding that the Condemnees "virtually eliminated conjecture and placed approval and development of the land squarely within the realm of a reasonable certainty, eliminating the primary bases for objection to the Development Approach" was supported by substantial evidence of record. Trial Court Opinion at 6.

■ The Condemnees experts also estimated damages using the comparable sales approach and the jury viewed the subject property. Thus, even if there was an error in admitting the expert testimony using the Development Approach, such error was harmless.

■ Where the jury views the premises, as in this case, its award is entitled to special weight upon appellate review. *Redevelopment Authority of the City of Philadelphia v. Nunez,* 109 Pa.Cmwlth. 240, 530 A.2d 1041 (1987). This Court has also held that the jury may base its decision on its own judgment and disregard the expert testimony entirely. *Appeal of Redevelopment Authority of the City of Scranton,* 156 Pa.Cmwlth. 388, 627 A.2d 292 (1993).

Third, the Airport Authority contends that the trial court erred in permitting the Condemnees to value the proposed individual lots with sales of property that are not comparable to the land and/or pre-condemnation offers.

■ As discussed above, the Condemnees did not value the lots individually,

but as a whole. The trial court is authorized to determine if a sale is judicially comparable. *Tedesco v. Municipal Authority of Hazle Twp.*, 799 A.2d 931 (Pa. Cmwlth.2002). In *Tedesco*, our Court found in pertinent part as follows:

A trial court has the duty of determining whether a comparable sale is admissible or, as it is often articulated by our courts, "judicially comparable." Whether particular valuation evidence is probative and relevant, and thereby admissible, is determined on a case-by-case basis.... The trial court considered the Authority's objections but found that these differences were explained for the jury by the experts and developed by counsel on cross-examination. We cannot disturb the trial court's decision with respect to judicially comparable sales unless we find a "gross" abuse of discretion. (citations omitted).

*Id.*, 799 A.2d at 936–937.

In the present controversy, we were unable to find a "gross" abuse of discretion. The trial court reviewed the Airport Authority's objection and found that the differences in the comparable properties were explained for the jury by the Condemnees as well as by the Airport Authority. Thus, we cannot disturb the trial court's decision with respect to the judicially comparable sales.

Fourth, the Airport Authority contends that the trial court erred in permitting improper testimony and evidence on the proposed subdivision plans from the Condemnees' witnesses and/or the preclusion of testimony and evidence on the proposed subdivision plans from the Airport Authority's witnesses.

The trial court took evidence on what the highest and best use of the property was at the time of the condemnation. The Airport Authority argued that it was farmland and Condemnees argued that it was residential development. A review of the record reveals that testimony regarding an offer to purchase the property as well as testimony regarding the housing market at the time of the condemnation, was offered not to determine the value of the property, but to establish a demand for the property in determining the highest and best use.

The Airport Authority also argues that submitting the subdivision plans and sale of comparable properties into the record was improper.

The admission or exclusion of evidence is within the sound discretion of the trial court, whose decision will not be disturbed absent a clear indication of abuse of that discretion. *Henry v. McCrudden*, 133 Pa.Cmwlth. 231, 575 A.2d 666 (1990), *petition for allowance of appeal denied*, 526 Pa. 651, 585 A.2d 470 (1990). The record reveals that the subdivision plans were introduced to rebut testimony and evidence presented by the Airport Authority which characterized the plans as incomplete and incapable of receiving preliminary plan approval. Again, this evidence was presented to support the Condemnees' allegation that a residential development was the highest and best use for the property.

Fifth, the Airport Authority contends that the trial court erred in precluding the testimony and evidence from the Airport Authority's experts. "To constitute reversible error, a ruling on evidence must be shown not only to have been erroneous but harmful to the party complaining." *Hart v. W.H. Stewart, Inc.*, 523 Pa. 13, 15, 564 A.2d 1250, 1252 (1989).

A review of the record reveals that the Airport Authority was not precluded from admitting any relevant, competent evidence at trial. "The trial court

may exclude evidence that is irrelevant, confusing, misleading, cumulative or prejudicial." *Concorde Investments, Inc. v. Gallagher*, 345 Pa.Super. 49, 497 A.2d 637, 641 (1985). The Airport Authority attempted to present specific testimony from various witnesses which was objected to by the Condemnees. We find nothing improper with these exclusions by the trial court. We also note that the Airport Authority failed to properly preserve many issues before the trial court; such failure properly resulted in their waiver.

Finally, the Airport Authority contends that the trial court erred in permitting improper and prejudicial testimony and evidence on the timing of the subject condemnation and/or the Airport Authority's prior condemnations for the jury's consideration.

Again, the testimony in question goes to what should be considered the highest and best use of the property. The testimony on the comparable parcel in question here was admitted to show the Condemnees actual intent to develop the condemned parcel and as a comparable sale. We also note that there was no testimony regarding the amount paid for the comparable parcel. There was no error in the trial court's admission of this evidence.

█ In conclusion, we find that the jury's verdict was within the range of each expert's valuation and was based on a view of the property. We cannot say the verdict of the jury is so contrary to the weight of the evidence as to shock one's sense of justice. *Borough of Tamaqua v. Knepper*, 54 Pa.Cmwlth. 630, 422 A.2d 1199 (1980). Accordingly, we affirm the trial court.

Condemnees cross-appeal regarding the January 12, 2004 order of the trial court which denied Condemnees petition for reimbursement of costs and delay damages without prejudice to renew following final judgment. Condemnees contend that it would be more efficient, less costly and fairer for the trial court to determine issues regarding costs and delay damages prior to a determination of issues raised by the appealing party's post-trial motions.

Section 611 of the Code provides in pertinent part as follows:

> The condemnee shall not be entitled to compensation for delay in payment during the period he remains in possession after the condemnation, nor during such period shall a condemnor be entitled to rent or other charges for use and occupancy of the condemned property by the condemnee. Compensation for delay in payment shall, however, be paid at the rate of six per cent per annum from the date of relinquishment of possession of the condemned property by the condemnee, or if the condemnation is such that possession is not required to effectuate it, then delay compensation shall be paid from the date of condemnation: Provided, however, That no compensation for delay shall be payable with respect to funds paid on account, or by deposit in court, after the date of such payment or deposit. Compensation for delay shall not be included by the viewers or the court or jury on appeal as part of the award or verdict, but shall at the time of payment of the award or judgment be calculated as above and added thereto. There shall be no further or additional payment of interest on the award or verdict.

26 P.S. § 1–611. There is no doubt that Condemnees are entitled to delay damages. However, Condemnees have not been precluded from requesting delay damages with the trial court following a final order in this controversy, not to mention that our Court would be unable to determine the delay damages based upon the record that we have before us.

Accordingly, we must affirm the decision of the trial court.

**ORDER**

AND NOW, this 24th day of November, 2004 the order of the Court of Common Pleas of Lehigh County in the above captioned matter is affirmed.